**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Dalton A. TININENKO, Defendant and Appellant.**

**Cr. No. 1066.**

Supreme Court of North Dakota.

July 19, 1985.

Gail Hagerty, State's Atty., Bismarck, for plaintiff and appellee.

Charles L. Neff (argued) and Greg W. Hennessy, of Bjella, Neff, Rathert, Wahl & Eiken, P.C., Williston, for defendant and appellant.

VANDE WALLE, Justice.

Dalton Tininenko appealed from a criminal judgment entered by the county court of Burleigh County which found him guilty of driving while his license was under suspension. We affirm.

On June 17, 1984, Tininenko was stopped for speeding by a law-enforcement officer in rural Burleigh County. When the officer performed a computer check on Tininenko's driver's license, he determined that Tininenko was driving while his license was under suspension [hereinafter D.U.S.]. The officer arrested Tininenko and charged him with D.U.S. in violation of Section 39–06–42, N.D.C.C. At a bench trial on the D.U.S. charge, evidence was presented that Tininenko had previously been convicted of D.U.S. in December of 1983. The trial court found Tininenko guilty of the second D.U.S. charge and Tininenko appealed.

Tininenko appears to assert on appeal that he should have been given a hearing prior to suspension of his privilege to drive following the December 1983 conviction.

The United States Supreme Court in *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90, 96 (1971), stated, "... it is fundamental that except in emergency situations ... due process requires that when a State seeks to terminate an interest such as that here involved, it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." See also *State v. Knittel,* 308 N.W.2d 379 (N.D. 1981).

This court in *Kosmatka v. Safety Responsibility Division, Etc.,* 196 N.W.2d 402, 406 (N.D.1972), in interpreting the *Bell* decision, held:

"... the conviction on the DWI charge ... is within the emergency exception as enunciated in *Bell* and therefore a hear-

ing is not required to revoke Kosmatka's license, the reason being that the Legislature in effect has declared that a conviction on a DWI charge constitutes an emergency.... We determine that the interests of protecting the public create such an emergency as to outweigh the requirement of a hearing for ·a driver who has been convicted ... of a DWI charge.... The *Bell* decision, *supra,* does not require a hearing in all driver's license revocation cases...."

■ In *State v. Harm,* 200 N.W.2d 387 (N.D.1972), this court determined that the North Dakota statutes which operate to suspend without a hearing the license of a driver who is convicted of driving while his license was under suspension are constitutional and do not violate due process. The particular statutes referred to by this court in *Harm* and relevant to this case remain unchanged today. We stated in *Harm, supra,* 200 N.W.2d at 393–394:

"... Upon further study of *Bell* and our statutes, as they relate to this case, we find that the North Dakota statutory scheme, under the Operators' Licenses chapter (39–06, N.D.C.C.) and Section 39–16.1–07(2), N.D.C.C., which requires that a driver who operates a motor vehicle upon our highways while his operator's license is under suspension must furnish and maintain proof of financial responsibility, are not developed around liability-related concepts, which was the basis of the holding in *Bell.*

"Our statutes provide that it is a misdemeanor to drive a motor vehicle upon the highways when the privilege to do so is suspended (Section 39–06–42, N.D.C.C.).... The commissioner, upon receiving a record of the conviction of any person upon a charge of driving a vehicle while the license or driver's privilege of such person is suspended, shall extend the period of such suspension for an added like period and, if the original suspension was for an indefinite or unstated period of time, shall order an additional suspension for six months (Section 39–06–43, N.D.C.C.); provided such license

or driving privilege shall remain suspended and shall not thereafter be renewed nor a license issued to such person unless he shall give and thereafter maintain proof of financial responsibility (Section 39–16.1–07, N.D.C.C.)."

It is clear from the relevant sections of Chapters 39–06 and 39–16.1, N.D.C.C., and from our caselaw that a pre-suspension hearing was not required in this case. See also *State v. Sinner,* 207 N.W.2d 495 (N.D. 1973).

■ The primary thrust of Tininenko's appeal, however, is that he had no actual notice on June 17, 1984, nor for the five preceding months, that his driving privilege had been suspended by the Commissioner.

In furthering his no-notice argument Tininenko relies chiefly upon our decision in *State v. Knittel,* 308 N.W.2d 379 (N.D. 1981). In *Knittel,* the defendant appealed his conviction of D.U.S. The defendant had previously been arrested for driving while intoxicated and had pleaded guilty. Thereafter, the Driver's License Division sent notice of an opportunity for hearing on the suspension and an order for suspension to the defendant's correct address. The defendant testified at trial that he did not receive either of these mailings. The trial court granted the defendant's motion for dismissal. On appeal we determined that the issue of the alleged receipt of the notice of an opportunity for a hearing was controlling. In *Knittel, supra,* 308 N.W.2d at 384, we held that "notice of an·opportunity for a hearing sent by regular mail is insufficient to guarantee due process when the presumption of receipt raised by Section 31–11–03(24), N.D.C.C., is rebutted, ..."

We noted in *Knittel* that the issue of the alleged receipt of the order for suspension was resolved by *State v. Hagstrom,* 274 N.W.2d 197 (N.D.1979). In *Hagstrom,* because the defendant knew that the Drivers License Division intended to suspend his license, we affirmed the judgment of conviction even though the defendant asserted that he had not received the order of sus-

pension and that he had no actual knowledge of the license suspension.

We conclude this case is clearly distinguishable from *Knittel, supra.* Here, as we have noted, Tininenko is not entitled to a pre-suspension hearing.

Tininenko nevertheless asserts that the State's evidence failed to prove beyond a reasonable doubt that he had received notice that his driving privilege had been suspended. Tininenko's bookkeeper, Rebecca Schultz, testified that Tininenko had not received any order or notice of suspension from the North Dakota State Motor Vehicle Department during the period from approximately December 21, 1983, to June 17, 1984, at his Williston address.[1]

The State contended that Tininenko received actual notice of suspension of his driving privilege by way of a notice of suspension mailed to his Williston postoffice address by Norma Breckel, a State Highway Department, Drivers License Division, suspension clerk. Mrs. Breckel testified that on June 17, 1984, Tininenko's privilege to drive was under suspension. That particular suspension was originally imposed on December 21, 1983, because Tininenko had been convicted of driving under a prior suspension. The December 21, 1983, suspension was to be in effect for 14 days and until Tininenko furnished proof of financial responsibility. Because Tininenko failed to furnish proof of financial responsibility the suspension remained in effect.

Mrs. Breckel testified that a certified copy of the order of suspension with an effective date of December 21, 1983, was mailed to Tininenko's Williston, North Dakota, address on December 19, 1983. The December 19 mailing of the order of suspension was not returned to the Highway Department. Mrs. Breckel further testified that the Highway Department mailed other notices to Tininenko at his Williston address and that Tininenko responded.

The Highway Department had sent Tininenko a notice on December 7, 1983, stating that he should pay a $25 fee for reinstatement of his driving privilege. This notice was in regard to a matter different from the D.U.S. Mrs. Breckel testified that she received a response to the December 7 notice on January 25, 1984.

On cross-examination, Mrs. Breckel testified that when a driver fails to provide proof of financial responsibility, that being an administrative violation, the Highway Department does not then send a notice for an opportunity for a hearing prior to the suspension or continuation of the suspension. Thus the only notice that the Highway Department mailed indicating that Tininenko's license was under suspension was the order of suspension. Mrs. Breckel testified that she mailed the order of suspension by delivering the document to the mailroom in the Highway Department building. She testified that she had signed an affidavit on the order of suspension and had it notarized, that affidavit stating that she had placed the order of suspension in the mails of the United States Post Office.

The trial court determined that the evidence presented by Tininenko concerning nonreceipt of the notice of suspension failed to rebut the presumption of delivery of notice found in Section 31–11–03(24), N.D.C.C.

In *State v. Olmstead*, 246 N.W.2d 888, 890 (N.D.1976), *cert. denied* 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978), we explained the position of this court when faced with a review of evidence and the credibility of witnesses:

"On the question of credibility of witnesses, reading a cold transcript is no substitute for hearing and observing witnesses as they testify. Tones of voice, hesitations, confusion, surprise, and other telltale indications of mental state convey to trial judges and jurors much that is lost to appellate judges. If we were to

---

1. Dalton Tininenko maintains two residences, the principal one being in Williston, North Dakota, where he works most of the year as a carpenter and contractor. Tininenko has a family farm in rural Bainville, Montana, located just across the State line between North Dakota and Montana.

judge from the cold print, we might decide many cases differently than trial judges do, and this case might be one of them. But, if we decided differently, we would have no assurance that ours was the better decision. We are reluctant to reverse factual findings of juries or trial judges. Appellate courts have stated in many ways, in both civil and criminal cases, their determination to give respect to the findings of trial judges and juries. Sometimes they say they will not reverse if there is substantial evidence to support the verdict [*Kresel v. Giese*, 231 N.W.2d 780, 791 (N.D.1975)]; sometimes they say they will not substitute their judgment for that of the trial court or jury [*State v. Champagne*, 198 N.W.2d 218, 226 (N.D.1972); sometimes they speak of viewing the evidence in the light most favorable to the judgment [*State v. Neset*, 216 N.W.2d 285, 290 (N.D.1974); and sometimes they speak of their great reliance on the findings of the lower court [*In re Estate of Elmer*, 210 N.W.2d 815, 819 (N.D.1973)].

"In criminal cases we have repeatedly held that 'at the appellate level we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction.' *State v. Kaloustian*, 212 N.W.2d 843, 845 (N.D. 1973), and cases cited therein; *State v. Neset*, 216 N.W.2d 285, 287 (N.D.1974).

"However stated, these rules indicate a recognition that the truth can better be determined in the confrontation of the testimony of witnesses appearing in person than from a transcript of the testimony of those witnesses."

Here, the trial court heard the testimony of both Tininenko and his secretary, and of Mrs. Breckel. The court was able to observe the demeanor of each of them and to judge their credibility. The court accepted Mrs. Breckel's testimony as being correct. There was substantial competent evidence to support the court's factual determination and Tininenko has failed to leave us "... with a definite and firm conviction that a mistake has been committed." *State v. Olmstead, supra*, 246 N.W.2d at 890. See also *State v. Ennis*, 334 N.W.2d 827 (N.D.1983).

The judgment of conviction is affirmed.

ERICKSTAD, C.J., LEVINE, J., and JOHN O. GARAAS, District Judge, concur.

GARAAS, District Judge, participating in place of GIERKE, J., disqualified.

MESCHKE, Justice, concurring specially.

The issue in this case is: Did Tininenko have sufficient notice of suspension of his driver's license to be convicted of the criminal offense of driving while under suspension, a class B misdemeanor under N.D. C.C. § 39–06–42? [1]

It is well understood that a driver's license is a constitutionally protected interest. *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). Procedural due process requires notice prior to deprivation of such an interest. This is an "elementary and fundamental requirement of due process." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

Assumptions of knowledge or presumptions of notice, where in fact there is nei-

---

1. Tininenko's argument seems to also suggest that notice should have afforded opportunity for an evidentiary hearing, but he has not marshalled any significant legal or factual predicates why that should be so in these circumstances. Since the risk of error in mere extension of a suspension is minimal, it is doubtful to what extent, if any, an evidentiary hearing may be due constitutionally. *Matthews v. Eldridge*, 424 U.S. 319, 339–343, 96 S.Ct. 893, 904–907, 47

L.Ed.2d 18 (1976). Because that issue is not squarely presented in this case, there is no need to address it.

Nor, is any issue of the adequacy of the form of notice presented in this case. *See, Atkins v. Parker*, — U.S. —, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985); *See also, Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13–22, 98 S.Ct. 1554, 1562–1567, 56 L.Ed.2d 30 (1978).

ther knowledge or notice, do not normally suffice. At least, such notice is required as is reasonably calculated to give actual notice under the circumstances. *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983): "[C]onstructive notice can *never* suffice whenever there is a legally protected property interest at stake;" 103 S.Ct. at 2713, 77 L.Ed.2d at 190; [O'Connor, J. dissenting, characterizing the holding of the majority opinion].

In this case, the suspension was an "amended order of suspension," and apparently was a continuation of a prior suspension pursuant to N.D.C.C. § 39–06–43, because Tininenko had already been once convicted of driving while his license was suspended. Section 39–06–43 does not explicitly require notice of the extended or "amended" order of suspension, but N.D. C.C. § 39–06–33 does require notice of an initial order of suspension by ordinary mail.[2] Individualized adverse administrative action by the State against a person, which is later used as foundation for criminal charges of non-compliance against that person, certainly requires notice. "Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party . . .;" *Mennonite Board*

*of Missions, supra*, 103 S.Ct. at 2712, 77 L.Ed.2d at 188. (Emphasis in original.)

Notice is a matter of fact. *State v. Knittel*, 308 N.W.2d 379 (1981). Actual notice by ordinary mail is usually sufficient. "[T]he mails provide an 'efficient and inexpensive means of communication' . . . upon which prudent men will ordinarily rely in the conduct of important affairs;" *Greene v. Lindsey*, 456 U.S. 444, 455, 102 S.Ct. 1874, 1880, 72 L.Ed.2d 249 (1982).

But, there is also some frailty in notice by ordinary mail. As Justice O'Connor dissenting in *Greene, supra*, 456 U.S. at 460, 102 S.Ct. at 1883, observed, there is risk of "loss, misdelivery, lengthy delay, or theft" of ordinary mail and "unattended mailboxes are subject to plunder." When a statutory regime relies on the economy and efficiency of ordinary mail for the notice required by procedural due process, its purpose may fail if there is no actual notice. Where presumptive evidence "that a letter duly directed and mailed was received in the regular course of the mail" is "contradicted by other evidence," N.D.C.C. § 31–11–03(24), the issue of actual notice is for the trier of fact to decide. N.D.C.C. § 12.1–01–03(4).[3]

The use of permissive inferences and rebuttable presumptions for evidentiary purposes in a criminal case is still constitutionally permissible, as was well explained by

**2.** "Where a statute is subject to two possible constructions, one which is of doubtful constitutionality and one which is not, the latter must be adopted. *State v. Howe*, 247 N.W.2d 647 (N.D.1976). Accordingly, we construe the statute to require more than constructive notice. . . ."; *State v. Knittel*, 308 N.W.2d 379, 383 (N.D.1981).

**3.** We are referred to § 12.1–01–03 for the effect of presumptions in criminal cases by the Explanatory Note to the omitted rule on "Presumptions in Criminal Cases," at Rule 303, N.D.R.Ev.: "(Presumptions in criminal cases are governed by § 12.1–01–03, N.D.C.C.)" Interestingly, this proposed evidentiary rule, which was similar in effect to the statutory provisions of § 12.1–01–03(4), (see text at 11 Moore's Federal Practice, Appendix I–9), was also omitted from the Federal Rules of Evidence by Congress when the Rules of Evidence were enacted in 1974:
"The Committee deleted this Rule since the subject of presumptions in criminal cases is

addressed in detail in bills now pending before the Committee to revise the federal criminal code. The Committee determined to consider this question in the course of its study of these proposals." 1974 U.S.Code Congressional and Administrative News, p. 7051, at 7079 (legislative history and purpose of Pub.L. 93–595 enacting the Federal Rules of Evidence). However, the Comprehensive Crime Control Act of 1984, "the product of a decade long bipartisan effort . . . to make major comprehensive improvements to the Federal criminal laws," did not include any general provisions on the effects of presumptions in criminal cases, although it enacted at least one such evidentiary presumption. 1984 U.S. Code Congressional and Administrative News, pp. 3182–3717, particularly at 3184 and 3395. (Note that the effect of presumptions in civil actions is governed by Rule 301, N.D.R.Ev.).

Justice VandeWalle in footnote 6, *State v. Trieb*, 315 N.W.2d 649, 654 (N.D.1982).[4] Therefore, Tininenko's reliance on *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 ·L.Ed.2d 39 (1979), in an effort to sweep away the rebuttable presumption of receipt of a properly mailed notice, is misplaced.

Although the trial court in this case apparently was uncertain if actual notice was required by this Court's prior decision in *State v. Hagstrom*, 274 N.W.2d 197 (N.D. 1979), it should be noted that the Court in *Hagstrom* did not consider or decide the constitutional issue of notice. Here, the trial court did expressly determine that the mailed notice of the amended order of suspension was received:

> "I do not find that the evidence presented at trial rebuts the presumption of delivery of the notice in this case. The testimony of the defendant and ... [his] employee, were not persuasive."

Since "the presumed fact is deemed sufficiently proved to warrant submission of the issue" to the trier of fact, and since the trier of fact "may arrive at that judgment [the existence of the presumed fact] on the basis of the presumption alone ...," N.D. C.C. § 12.1–01–03(4), I concur with the majority opinion that there was substantial competent evidence to support the court's factual determination of notice.

Therefore, I concur in affirming the judgment of conviction.

---

4.  "[T]he evidence as a whole must establish the presumed fact beyond a reasonable doubt,...."; N.D.C.C. § 12.1–01–03(4)(b).